IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RICHARD SPEAR                                                    PLAINTIFF

V.                                    09-5142

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration              DEFENDANT

## MAGISTRATES REPORT AND RECOMMENDATION

Plaintiff, Richard Spear, brings this action pursuant to 42 U.S.C. §405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claims for a period of disability and disability insurance benefits

(DIB) under Title II of the Social Security Act (the Act) and Supplemental Security Income (SSI)

under Title XVI of the Act.  In this judicial review, the Court must determine whether there is

substantial evidence in the administrative record to support the Commissioner's decision.  See

42 U.S.C. §405(g).

## Procedural Background

Plaintiff filed his applications for DIB and SSI on July 28, 2007, and January 18, 2007,

respectively (Tr.39, 41, 44-46, 221-225), alleging disability since August 2, 2005.  (Tr. 41, 44).

Plaintiff's applications were denied initially and upon reconsideration.  (Tr. 31-33, 35-36, 227-

229, 231-232).  Pursuant to Plaintiff's request, a hearing was held before an Administrative Law

Judge (ALJ) on July 29, 2008, where Plaintiff and a Vocational Expert (VE) testified.  (Tr. 233-

280).  On March 25, 2009, the ALJ entered his decision, denying Plaintiff's request for a

determination of disability.  (Tr. 8-21) .  The ALJ found that Plaintiff had the following severe

-1-

AO72A
(Rev. 8/82)

impairments: disorders of the back and major depressive disorder. (Tr. 14). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, and after careful consideration of the entire record, found that Plaintiff had the residual functional capacity (RFC) to perform light work with certain limitations, meaning that the Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, could sit for six hours during an eight-hour workday, could only have interaction with co-workers and supervisors that was incidental to the work performed, and could have only occasional contact with the general public. He also found that Plaintiff could only perform unskilled work. (Tr. 15). Plaintiff's request for review was denied by the Appeals Council on May 20, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 3-5).

**Evidence Presented**

Plaintiff was born in 1966, graduated from high school, and attended a year of vocational school in carpentry and cabinet making. (Tr. 41, 243). He is 5'6" tall and weighs 207 pounds. (Tr. 239-240). Plaintiff worked for various companies from 1991 until 2006, with the longest employment as a driver at a Wal-Mart warehouse, from 2000 to 2006. (Tr. 78). He began at Wal-Mart unloading trucks, then drove a forklift, and finally drove a yard truck. (Tr. 79).

In 1999, Plaintiff began having back pain, and on November 2, 2000, Dr. David J. Tucker, his treating physician, reported tenderness and spasm of his right paravertebral back muscles, concluding that it was musculoskeletal back strain. (Tr. 218). The next medical record was dated February 27, 2003, when Plaintiff went to see Dr. Tucker at Gravette Medical Associates, Ltd., complaining that he fell the previous day and landed on his head and neck. He

-2-

complained of loss of mobility and lower back pain.  (Tr. 216).  He continued to see Dr. Tucker

for low back pain on December 17, 2003, January 27, 2005, February 9, 2005, and on February

23, 2005, when he was then found to be markedly improved, with no further problems or

difficulties, and wanted to return to work.  (Tr. 206- 208, 211).   In the February 9, 2005 report,

Dr. Tucker reviewed a previous x-ray of the lower back, which was negative for fracture.  X-rays

of the paracervical neck muscles were also negative.  (Tr. 216).

On August 28, 2006, Plaintiff presented himself to Ozark Guidance, Inc. (OGI),

complaining of feeling depressed to the point where he did not want to do anything.  (Tr. 170).

He reported that he would get half-way to work and turn around and go home.  He also reported

that two times previously, he had bad anger attacks and feared he would hurt someone.  (Tr.

170).  He was worried about his anger, stating that he had never been suicidal, but had homicidal

thoughts at times.  (Tr. 169).  Plaintiff was initially diagnosed by Audrey Adams at OGI with:

    Axis 1- Major Depressive Disorder Recurrent Unspe. - R/O Bipolar
           Posttraumatic Stress Disorder
           Anxiety Disorder NOS
    Axis 2- Diagnosis deferred on Axis 2
    Axis 3- None known for Axis 3 - Plaintiff reports a lot of history with back pain, frequent
    headaches, allergies to pollen and mold.  DX with sleep apnea.
    Axis 4- Problems with primary support group; problems related to social environment;
    occupational problems; economic problems; problems related to interaction with the
    legal system/crime; other psychological and environmental problems.
    Axis 5- Current Global Assessment of Functioning:[1]

(Tr. 169).  On September 29, 2006, Plaintiff was seen at OGI by Dr. Ester Salvador, and

complained of depression, anxiety, and mood swings.  (Tr. 158).  Plaintiff stated that he had been

depressed for about 4 to 5 years, but was more so during the past 6-10 months.  He reported that

[1]No GAF number was given in this report.

-3-

AO72A
(Rev. 8/82)

he had no energy and that his concentration, focus, attention and memory had failed.  (Tr. 158).

He reported that there was a time when he was so mad at his wife's ex-husband that he threw a

bomb in his garage, but it did not go off.  (Tr. 159).  He further reported that two years prior he

hired a hit man to kill his wife's ex-husband, but that the person took his $500 but did not kill

him.  He recently considered killing him himself, but realized that he did not want to go to jail

for killing someone.  (Tr. 159).  Plaintiff reported that he had obstructive sleep apnea and used

a C-PAP machine, and that he had back pain.  Plaintiff's IQ was estimated to be within average,

his insight and judgment were poor, and Dr. Salvador diagnosed Plaintiff with:

> Axis I - Major Depressive Disorder Recurrent Moderate to Severe without Psychosis - rule out bipolar disorder.  It was noted that Plaintiff did a mood disorder questionnaire and had 13 "yes" and his mother had been in institutions multiple times for bipolar disorder.  (Tr. 161).
> PTSD
> Anxiety Disorder NOS
> Axis 2 - Antisocial Traits v. disorder
> Axis 3- Obstructive Sleep Apnea, the patient is on C-PAP machine;  Back pain; frequent headaches.
> Axis 4 - Problems with primary support group, problems related to social environment, occupation and economic problems, problems related to interaction with the legal system/crime;  other psychological and environmental problems.
> Axis 5 - Current GAF - 40-45

(Tr. 161).  He was taking 10 mg. Lexapro daily and was asked to increase it to 20 mg. daily.

On October 11, 2006, Plaintiff reported that things were a little better for him and that

he had less anxiety.  (Tr. 156).  By December 12, 2006, Plaintiff reported to Dr. Salvador that

he was more mellow and noted that his impulsive behavior and anger were much under control.

He reported no adverse side affects from his medications. (Tr. 152).  He was then assessed with

Major Depressive Disorder, Rule Out Bipolar Disorder.  (Tr. 152).  On February 20, 2007,

Plaintiff reported to Dr. Salvador that he believed his medicines were working because he had

-4-

not been getting angry, and he reported no adverse side effects from his medication.  (Tr. 148).

On April 30, 2007, Plaintiff reported to OGI that in the recent past, his medication had not been

taken regularly.  (Tr. 146).  On May 31, 2007, Plaintiff reported to Dr. Salvador that his wife

noted that he was getting irritable again, and that he was worried because his anger was coming

back.  (Tr. 144).  He reported that he saw cartoon characters in his head talking to each other and

fighting with each other.  Plaintiff was assessed at this time with bipolar disorder, with possible

psychosis.  (Tr. 144).

On July 10, 2007, Plaintiff advised Dr. Salvador that he was doing better - did not hear

the cartoons anymore - and his mood was improved.  (Tr. 139).  He was assessed as having

bipolar disorder with psychosis (resolved). (Tr. 139).  On August 1, 2007, Plaintiff was reported

as doing well.  (Tr. 137).  On September 10, 2007, Plaintiff reported to Dr. Salvador that he was

arrested for a check he wrote some years prior and had an anxiety attack over the weekend.  (Tr.

135).  He also said that he thought his medications were working.  (Tr. 135).  Dr. Salvador

assessed Plaintiff with bipolar disorder with psychosis.

On October 8, 2007, Plaintiff saw Dr. Tucker, complaining of abdominal and chest pain.

Dr. Tucker's impression was abdominal pain, probable GERD (gastroesophageal reflux disease)

v. PUD (peptic ulcer disease); Bronchitis/RAD; Sinusitis; and lumbar pain and strain.  (Tr. 199).

On October 10, 2007, Brad F. Williams, Ph.D., prepared a Psychiatric Review Technique

Report.  (Tr. 110-123).  He found Plaintiff to have a mild degree of limitation in restriction of

activities of daily living; a moderate degree of limitation in difficulties in maintaining social

functioning and concentration, persistence, or pace; and no episodes of decompensation, each

of extended duration.  (Tr. 120).  Dr. Williams noted that with respect to Plaintiff's back

AO72A
(Rev. 8/82)

problems and bipolar disorder, the records suggested that Plaintiff had been responding to treatment and that his bipolar disorder was resolving. (Tr. 122). He believed the Plaintiff was capable of basic employment, if so motivated. (Tr. 122).

On October 10, 2007, Dr. Williams also prepared a Mental RFC Assessment. (Tr. 180-183). Dr. Williams found that Plaintiff was moderately limited in six out of 20 categories, and was not significantly limited in 14 out of 20 categories. (Tr. 180). He found that Plaintiff was able to perform work where interpersonal contact was incidental to work performed, where the complexity of tasks was learned and performed by rote, with few variables, little judgment, and where supervision required was simple, direct and concrete. (Tr. 182).

On October 23, 2007, a general physical examination was conducted by Dr. K. Marcus Poemoceah. (Tr. 125-131). Dr. Poemoceah noted Plaintiff's back pain as located in his low back, with radiation down the right leg at times. Dr. Poemoceah noted that Plaintiff previously had an x-ray and physical therapy, but no CAT scans or MRI's, and was controlled on pain medication. He also noted that a stress test was reported as normal four years prior thereto. (Tr. 125). He stated that Plaintiff's back pain was "controlled on pain medication right now." (Tr. 125). He also noted Plaintiff's sleep apnea, for which he had a C-PAP machine, and his bipolar disorder, stating that he "is on medication for this and seems to be controlled with this." (Tr. 125). Dr. Poemoceah stated that Plaintiff's medications were Cyclobenzaprine; Ultram; Depakote; Vegra; and Lexapro. (Tr. 125). He found Plaintiff's reflexes in his biceps, triceps, patellar, and achilles to be all symmetrically diminished, with no muscle weakness or atrophy, and his gait and coordination were normal. (Tr. 129). Plaintiff was able to squat about half way and come back up. (Tr. 129). Plaintiff was diagnosed by Dr. Poemoceah with bipolar disorder;

-6-

low back pain; degenerative disc disease; and sleep apnea.  (Tr. 131).

A Vocational Analysis was prepared on October 31, 2007, by Gilbert Harris, a Vocational Analyst, who reported that Plaintiff had the mental capacity to perform work where interpersonal contact was only incidental to work performed, where performed tasks could be no more complex than those learned and performed by rote, with few variables and little judgment; and where supervision required would be simple, direct and concrete.  (Tr. 86).  In his report, Mr. Harris stated that there were no physical restrictions.  (Tr. 86).  He stated that although Plaintiff could not return to his past relevant work, he could return to other jobs, such as signaler, flagger, and asphalt-distributer tender.  (Tr. 86).

On November 12, 2007, Plaintiff advised Dr. Salvador at OGI that he had been pretty depressed lately, but was not seeing pictures in his mind anymore.  Dr. Salvador assessed Plaintiff with bipolar disorder with psychosis.  (Tr. 133).  On December 18, 2007, Dr. Salvador reported Plaintiff as being more depressed, feeling lonely and suffering from a financial crunch and the holidays.  He reported no adverse side effects on his medication, but was running low.  (Tr. 132).

On February 25, 2008, Dr. Tucker saw Plaintiff and found him to have lumbar pain and strain with degenerative joint disease (DJD) of the lumbar spine.  (Tr. 194).  Plaintiff stated that he could not afford any medication, but would complete his medical assessment.[2]  (Tr. 194).  On June 28, 2008, Dr. Tucker completed a Medical Assessment of Ability to do Work-Related Activities (Physical).  (Tr. 189-191).  Dr. Tucker found that Plaintiff would be able to

---

[2] When Plaintiff visited OGI on February 20, 2007, Dr. Salvador stated that she always encouraged him to apply for the prescription assistance program.  (Tr. 148).  Plaintiff told her that he got the form but thought that one of his grandchildren fed the paper to the shredder.

occasionally lift/carry a maximum of 20 pounds; frequently a maximum of 15 pounds; could stand/walk a total of 4 hours - 30 minutes without interruption; sit for a total of 4 hours - 1 hour without interruption; could climb, kneel, and crawl occasionally; and could not stoop or crouch. (Tr. 189-190). Plaintiff's ability to reach, handle, feel, push/pull, speak, see, or hear were found not to be affected by Plaintiff's impairments, and there were no environmental restrictions. (Tr. 190-191). In response to the question of whether there were any other work-related activities which were affected by impairments and how the activities were affected, Dr. Tucker stated that Plaintiff must stop to rest frequently, and had non-functional ability to bend and lift. (Tr. 191).

At the hearing held on July 29, 2008, Plaintiff stated that the bipolar disorder caused his depression and that he was being treated with medication for the disorder, and that his back was the main impairment that limited him. (Tr. 245). He stated that Dr. Tucker had been his family physician for twenty years, and that because he did not have insurance and his wife did have insurance, he went to Dr. Tucker when his wife went, and Dr. Tucker usually gave him a prescription for his pain killers or muscle relaxers at that time. (Tr. 246). He also said that Dr. Tucker gave him samples of medications. (Tr. 247). At the time of the hearing, Plaintiff was taking Cyclobenzaprine, Ultram, Depakote, Lexapro and Invega. (Tr. 247). He testified that he suffered from a lot of fatigue as a side effect, that he did not sleep well, and was tired all the time. (Tr. 247). He further testified that the Invega that he took for visions in his head was not really working like it was supposed to. (Tr. 248). He stated that he could be talking to a person and that person could be talking to him and then he would zone out and not hear what the person was saying, making it difficult to concentrate. (Tr. 248).

Plaintiff's wife ran a newspaper route and he stated that he tried to help her with it by

helping her roll the papers and occasionally delivering part of her route for her if his back was not really hurting. (Tr. 250). He spent approximately five or six hours a week helping his wife with the route. (Tr. 251). He stated that he was able to dress himself and bathe and groom himself, make himself a sandwich, and could mow for about 30 to 45 minutes before he had to stop and rest. (Tr. 254). He stated that he could drive, but that his wife usually drove. (Tr. 255). He stated that he could walk 10 minutes before he was bothered by his back, and could stand between 10 and 20 minutes before his back bothered him. (Tr. 257). He was able to sit for one to two hours at one time. (Tr. 257). Plaintiff further stated that he had suicidal thoughts, but more often he had thoughts of how to kill people. (Tr. 259). The murderous thoughts came through the cartoon characters that he envisioned. (Tr. 259). Plaintiff stated that the reason he first went to OGI was because he had lost the will to do anything and saw something on television about depression, and he did not have any money. He stated that he went to OGI at least once a month and saw a psychiatrist at least every two months. (Tr. 261).

Plaintiff testified that he has had problems with his back since as far back as the mid to late 90's, and filed for disability then because he was having so many back problems. (Tr. 262). He said that he was "denied the first time around so I just went out and got a job at Wal-Mart and went back to work in 2000." (Tr. 262). He thereafter began missing work probably three to four days a month. (Tr. 262). Plaintiff stated that his back would not take returning to a simple job and that he would not trust his mind at a job like his previous one because the visions would affect him while he was driving. (Tr. 268).

Plaintiff's wife testified at the hearing, stating that she had noticed a drastic change in Plaintiff's mental condition since they were married. She stated that he used to take pride in his

-9-

appearance, but over the past five years, he did not take pride in much of anything.  (Tr. 269).

She testified that he took a bath once every two weeks rather than once a day like he used to, and

focused on a lot of negative things.  (Tr. 269).  He began sharing the existence of his cartoon

characters with her about three years prior.  (Tr. 269).  She stated that he drifted off during

conversations, and took a lot of naps.  (Tr. 270).  She further stated that he did not go anywhere

without her because she did not know where he would end up, since he forgot what he was

supposed to be doing.  (Tr. 271).  Plaintiff testified that he went to bed at about 6:00 am when

his wife came back from the paper route, then was up by noon or 1:00 and spent some time on

the computer.  (Tr. 250).  He watched some television and was usually tired again.  He took a

nap and got up at around dinnertime and ate.  He watched television and then went to bed.  (Tr.

250).

In an undated Disability Report, Plaintiff stated that his back pain prevented him from

lifting, sitting or walking for long periods of time.  (Tr. 62).  In a Function Report dated

September 15, 2007, he stated that someone had to tell him to take care of his personal needs and

grooming, and to take his medicine.  (Tr. 70).  He stated that he went outside very little and did

not like to be around other people.  He said that he did not get along with authority figures,

because he felt they thought they were better than him.  (Tr. 74).  He stated that he had been fired

or laid off from three different places, did not handle stress, and had severe anxiety attacks.  (Tr.

74).

At the hearing, the Vocational Expert (VE) was presented with the first hypothetical:

Please assume a younger individual with a high school education and who can lift and
carry 20 pounds occasionally and 10 pounds frequently.  The individual can sit for a total
of six hours during an eight-hour workday and can stand and walk for a total of six hours

-10-

> during an eight-hour workday.  The individual can have interaction with co-workers and
> supervisors as incidental to the work performed.  The individual can have occasional
> interaction with the general public.  The individual would be limited to performing
> unskilled simple one to two step repetitive tasks.  Would there be jobs available for this
> individual to perform?

(Tr. 273).  The VE responded by saying that the individual would be able to perform light,

unskilled work such as assembly work production, cleaner, housekeeper, maid, and poultry-

processing worker.  (Tr. 273-274).  The ALJ then presented the VE with a second hypothetical:

> Assume a younger individual with a high school education ..., who can lift and carry 20
> pounds occasionally and 10 pounds frequently....  The individual can sit for a total of four
> hours during an eight-hour workday.  The individual can stand and walk for a total of
> four hours during an eight-hour workday. ...  The individual can occasionally climb,
> kneel, balance, and crawl. And the individual can never stoop or crouch.  The individual
> can have interaction with co-workers and supervisors as incidental to the work
> performed.  The individual can have occasional interaction with the general public and
> the individual can perform unskilled simple one to two step repetitive tasks.  Do you
> understand the hypo as I posed it?

(Tr. 274).  The VE responded that there would be no jobs available.  Plaintiff's attorney then

asked the VE to assume that the individual could not do any sit/stand jobs who had absences at

least three to four times, unscheduled, each month, and that he would have to rest frequently

throughout the day - about three or four times during the day from five to fifteen minutes,

unscheduled, and added that the person had non-functional ability to bend and lift.  The VE

stated that this would take the individual out of all light and unskilled and sedentary and

unskilled work in the national and state economy.  (Tr. 277).

> A third hypothetical was presented to the VE by the ALJ:

> Please assume a younger individual with a high school education who can lift and carry
> 10 pounds occasionally, 5 pounds frequently.  The individual can sit for a total of six
> hours during an eight-hour workday, can stand and walk for a total of two hours during
> an eight-hour workday.  The individual can...have interaction with co-workers and
> supervisors as incidental to the work performed.  The individual can have occasional

-11-

interaction with the general public.  The individual can perform unskilled simple one to two step repetitive tasks.  So that basically describes sedentary with addition.

(Tr. 277-278).  The VE responded that there were jobs that the individual would be able to perform - surveillance system monitor, clerical addresser, and escort vehicle driver.  (Tr. 278). The Plaintiff's attorney then asked the VE to assume additional factors to the third hypothetical, such as, the individual must take unscheduled breaks throughout the day  - meaning three to four unscheduled breaks per day, would have trouble maintaining pace, concentration, and persistence due to the side effects of medication and interference with his thinking because of auditory and visual hallucinations, and would have difficulty attending to a quota based job.  (Tr. 279).  The VE stated that the individual described by the attorney would not be employable in the national or state economy on a sustained basis in the competitive labor market.  (Tr. 279).

**Applicable Law**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.  The ALJ's decision must be affirmed if the record contains substantial evidence to support it.  Edwards v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from

AO72A
(Rev. 8/82)

the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity (RFC).  See McCoy v. Schwieker, 683 F.2d 1138, 1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

-13-

**Discussion**

**A.  Plaintiff's Impairments**

The ALJ found that Plaintiff engaged in substantial gainful activity from August 2, 2005, the alleged onset date, until August 16, 2006, and that after August 16, 2006, he did not engage in substantial gainful activity.  (Tr. 13).  Therefore, since Plaintiff did not engage in substantial gainful activity since August 16, 2006, the ALJ properly proceeded with the five step sequence analysis from that date.  The ALJ found that Plaintiff suffered from disorders of the back and major depressive disorder.  He then examined Listings 1.04 and 12.04, and determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The Court is of the opinion that the ALJ thoroughly and properly evaluated Plaintiff's impairments in light of the relevant listings, and came to the correct conclusion that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.

**B.  Plaintiff's Credibility and Residual Functional Capacity**

The ALJ found, after careful consideration of the evidence, that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  However, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC capacity assessment

Regarding the degenerative disk disease, the ALJ found that some weight could be accorded Dr. Tucker's June 28, 2008 opinion, and he accepted Dr. Tucker's lifting and carrying

-14-

restrictions.  However, the ALJ found that the remaining restrictions imposed by Dr. Tucker were not consistent with the record as a whole and were discounted.[3]  It is true that Plaintiff complained to Dr. Tucker on February 9, 2005, of back pain, had improved greatly by February 23, 2005, and then did not see Dr. Tucker again for back pain until October 8, 2007.  In addition, Plaintiff continued to work at Wal-Mart until August of 2006.  However, it should be noted that Dr. Tucker, who had been treating Plaintiff for twenty years,  reported on October 8, 2007, that Plaintiff had been having a lot of problems with low back pain for quite some time and had difficulty bending and lifting.  (Tr. 199).  On February 25, 2008,  Dr. Tucker reported that Plaintiff continued to have problems with low back pain, and difficulty bending, lifting, and twisting.  Dr. Tucker stated that Plaintiff had been on anti-inflammatories in the past without much improvement.  He noted that Plaintiff's back would clear up for a period of time but then recur, requiring him to rest.  "The only thing that has really helped him stay pain free is frequent rest periods."  It is therefore very possible that Plaintiff's back impairment may have become more severe by June 28, 2008, the date of Dr. Tucker's medical assessment, wherein Dr. Tucker found that Plaintiff was not able to crouch or stoop at all, required frequent stops to rest and had non-functional ability to bend or lift.

Dr. Poemoceah, on the other hand, examined Plaintiff on October 23, 2007,[4] and Gilbert Harris, the Vocational Analyst, did not examine Plaintiff at all.  A treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and

---

[3]Dr. Tucker's other restrictions included the fact that Plaintiff could not stoop or crouch, and required frequent stops to rest, and had non-functional ability to lift and bend.

[4]The Court notes that Dr. Peomoceah saw Plaintiff two times in 1999 - once for a cough and congestion, and the other for back pain.  (Tr. 218).

-15-

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.  Pirtle v. Astrue, 479 F.3d 931, 933  (8th Cir. 2007), quoting from Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000); 20 C.F.R. § 404.1527(d)(2)(2000).   The ALJ's conclusion that Plaintiff could perform certain jobs was not based upon the total findings of his treating physician, Dr. Tucker, which were more recent than Dr. Poemoceah's, and the ALJ did not give sufficient reason for discounting the most recent findings of Dr. Tucker.  The Court therefore recommends that this matter be remanded to the ALJ with instructions to obtain x-rays, MRI's or CT scans of Plaintiff's back and to obtain another RFC assessment from another examining physician.

With respect to Plaintiff's mental impairment, the records reflect that Plaintiff suffered from bipolar disorder, with psychosis.  The most recent mental diagnosis is dated December 18, 2007, from Dr. Ester Salvador.  Both OGI counselors Salvador and Adams had been treating Plaintiff for his mental impairments since 2006, and diagnosed him with bipolar disorder with psychosis.  After Brad Williams reviewed the medical records and prepared his October 10, 2007 Mental RFC Assessment, Plaintiff reported to Dr. Salvador that he had become more depressed.  Although Plaintiff was taking medication for his depression and visions,  he stated at the July 29, 2008, hearing that his medicine for visions was not really working like it was supposed to and that he continued to have visions in his head.  He was going to discuss this with his counselor at OGI at his next appointment.  He also stated that the cartoon characters that he saw in his visions talked to each other about killing each other, and that the psychiatrist called them "murderous thoughts."

Based upon the more recent indications that Plaintiff's mental impairment may not, in

-16-

fact, be under control with medication, the Court finds it necessary to remand this matter to the ALJ in order for him to obtain a Mental RFC Assessment from Dr. Ester Salvador at OGI.  The ALJ should then re-evaluate Plaintiff's impairments in light of the new Mental and Physical RFC Assessments.

**Conclusion**

Based upon the foregoing, having carefully reviewed the record, the undersigned recommends that this matter be reversed and remanded, pursuant to sentence four of 42 U.S.C. §405(g), directing the ALJ to further develop the record in accordance with the instructions in this report and recommendation.

**The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Entered this 21st day of July, 2010.


/s/ Erin L. Setser
HONORABLE ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE